UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KANCHAN CHANDRA, | |
| Plaintiff, | COMPLAINT |
| -against- | Civil Case No. _____ |
| NEW YORK UNIVERSITY, NEW YORK UNIVERSITY IN ABU DHABI CORPORATION, PAULA ENGLAND, in her individual capacity, HERVÉ CRÈS, in his individual capacity, and JEFFREY TIMMONS, in his individual capacity, | Jury Trial Demanded |
| Defendants. | |

Plaintiff Kanchan Chandra (herein Plaintiff or Professor Chandra), by her attorneys Charny & Wheeler P.C., alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows.

<u>INTRODUCTION</u>

1.      Professor Chandra, a woman of Indian National Origin, has enjoyed decades' long success as a Professor of Politics at Defendant New York University, teaching, researching and writing in the field of Comparative Politics and Comparative Political Economy, with a specialization in the study of Ethnic and Identity Politics, Democratic Theory, Violence and South Asian Politics.

2.      Beginning in the academic year 2018-2019 and continuing to the academic year 2021-2022, Plaintiff enjoyed Joint Appointment with Defendant New York University in Abu Dhabi Corporation (herein NYUAD).

3.      At that time, upon information and belief, Plaintiff was one of only two women to be tenured full-time Full Professors at Defendant NYUAD out of a score or more of tenured full-time Full Professors at Defendant NYUAD.

4.      During this period of time, Plaintiff, along with many other women faculty at NYUAD suffered under gender-based hostility within the Defendant NYUAD workplace.

5.      When Plaintiff complained about gender discrimination within the NYUAD workplace, Plaintiff faced immediate and visceral retaliation, which included Plaintiff's Joint Appointment being terminated and Plaintiff being returned, against her wishes, and in a humiliating manner, back to New York, with no opportunity to rehabilitate her standing within the community.

6.      The discrimination and retaliation permeated and permeates the culture within Defendant NYU and Defendant NYUAD, emanating from those in positions of authority, and the discrimination and retaliation continued over time despite a number of changes in leadership.

7.      Defendant NYUAD has a culture of impunity that affects women disproportionately.  A climate survey conducted in 2021 reported that "high numbers of participants (31.4%) who indicated that their experiences at NYUAD were NOT FREE of harassment, bullying and/or intimidation;" that "36% of women said that their experience at NYUAD were not free of harassment compared to 27% of men"; and that "People who experienced harassment were also more fearful of retaliation.. which also explains the low rates of official complaints."

8.      Discriminatory and retaliatory conduct continues to date, undermining Plaintiff in her workplace at Defendant New York University (herein NYU) and blocking opportunities for the same engagement with Defendant NYUAD offered to all faculty at Defendant NYU.

9.    Defendants' conduct in this regard violates federal and state law that prohibits discrimination in the workplace and that prohibits retaliation for complaining about discrimination in the workplace.

<u>JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS</u>

10.    This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination against Plaintiff as well as Defendants' retaliation against Plaintiff.

11.    This Court has jurisdiction over this action under 29 U.S.C. §§ 2601 et seq., and under 28 U.S.C. §§ 1331 and 1367.

12.    Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

13.    Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on gender, race, national origin and retaliation, as well as a supplement to the same charges.  The EEOC has issued a Notice of Right to Sue and this action is commenced within ninety (90) days of the issuance of the Notice of Right to Sue.

<u>PARTIES</u>

14.    Plaintiff is a tenured Professor of Politics with Defendant New York University and for relevant times during the allegations of this Complaint was also jointly employed by Defendant NYUAD.

15.    Defendant NYU is a private research university in New York City.  NYU has more than 171 buildings spread through Manhattan and Brooklyn.  Defendant NYU is a global network university comprising more than a dozen Global Academic Centers and two full-fledged and degree-granting "portal campuses" in Abu Dhabi and Shanghai.

16.    NYU was incorporated as The University of the City of New York by Chapter 176 of the Laws of 1831 of the State of New York, the name of which was subsequently changed to New York University.

17.    Article 4 of Defendant NYU's Charter provides that, "[t]he principal office of New York University shall be in the City and State of New York, but New York University shall have the power to conduct and operate educational research and other programs and attendant facilities . . . in locations outside of the State of New York."

18.    During the events described herein and upon information and belief, Defendant NYU maintained a main campus at 70 Washington Square South, New York, New York, 10012.

19.    Defendant NYUAD is a New York domestic not-for-profit corporation organized under the laws of the State of New York.  Defendant NYUAD maintains an address at 70 Washington Square South, New York, New York, 10012.

20.    Defendant NYUAD is Defendant NYU's Abu Dhabi campus.

21.    Defendant NYUAD is controlled by Defendant NYU and is a U.S. company with far in excess of fifteen (15) employees.

22.    During the events described herein, Defendant NYUAD maintained offices at 19 Washington Square North, 14 New York, New York, 10011.

23.    NYU describes the "seamless international mobility" of students and faculty between NYU and NYUAD in their pursuit of academic and scholarly activity as a distinctive feature of its brand.

24.    Between 2018 and 2022 Defendant NYU and Defendant NYUAD jointly employed Plaintiff.

4

25.     Upon information and belief, Defendant NYUAD is controlled by Defendant NYU and Defendant NYUAD is required to report to the President of Defendant NYU on a monthly and/or yearly basis.

26.     Upon information and belief, Defendant NYU exerts financial control over Defendant NYUAD, and they are a single enterprise.

27.     For all relevant times, Defendants NYU and NYUAD jointly and severally met the definition of an "employer" under all applicable statutes.

28.     For all relevant time periods until August 31 2020, Defendant Hervé Crès was Dean of the Division of Social Sciences at Defendant NYUAD.

29.     Defendant Crès actually participated in the conduct giving rise to the discrimination and retaliation alleged herein and as such is subject to personal liability under the New York State Human Rights Law and the New York City Administrative Code.

30.     Beginning in June 2021 and continuing for all relevant time periods, Defendant Paula England was announced as and then installed as the Dean of Social Sciences at NYUAD.

31.     Defendant England actually participated in the conduct giving rise to the discrimination and retaliation alleged herein and as such is subject to personal liability under the New York State Human Rights Law and the New York City Administrative Code.

32.     For all relevant time periods, Defendant Jeffrey Timmons was Program Head of the Politics Program and Associate Professor of Politics at NYUAD and promoted from that position during the course of the acts complained of in this Complaint.

33.     Defendant Timmons actually participated in the conduct giving rise to the discrimination and retaliation alleged herein and as such is subject to personal liability under the New York State Human Rights Law and the New York City Administrative Code.

FACTS

34.     In 1993, Plaintiff graduated from Dartmouth College Summa Cum Laude, Phi Beta Kappa, Senior Fellow, Colby Prize in Government with a BA in Government.

35.     In 2000, Plaintiff was awarded a Ph.D. in Government from Harvard University.

36.     At that time, in 2000, Plaintiff was appointed by Massachusetts Institute of Technology (herein MIT) as an Assistant Professor, Department of Political Science.

37.     In 2004 Plaintiff was promoted by MIT to Associate Professor, Department of Political Science.

38.     In 2005 Plaintiff was appointed by Defendant NYU as Associate Professor in the Wilf Family Department of Politics, with tenure.

39.     In 2011, Plaintiff was promoted by Defendant NYU to Full Professor in the Wilf Family Department of Politics, with tenure.  She continues to hold that position to date.

40.     At Defendant NYUAD, Plaintiff was Professor of Politics in the Politics Program in the Social Science Division between 2018 and 2022.

41.     There are close connections between the Wilf Family Department of Politics at Defendant NYU and the Politics Program at Defendant NYUAD.

42.     Faculty from the Wilf Family Department of Politics at Defendant NYU routinely serve on Faculty Review Committees (FRCs) for the promotion and tenure of faculty Politics Program at Defendant NYUAD.

43.     Faculty from the Wilf Family Department of Politics at Defendant NYU routinely teach courses at Defendant NYUAD or sponsored by Defendant NYUAD in other sites during "J-term."

44.    Faculty from the Wilf Family Department of Politics at Defendant NYU sponsor graduate students to be hosted by the Politics Program at Defendant NYUAD

45.    Faculty from the Wilf Family Department of Politics at Defendant NYU teach and mentor undergraduate students from Defendant NYUAD when students visit Defendant NYU.

46.    Faculty from the Politics Program at Defendant NYUAD teach, advise or employ students from Defendant NYU when students visit the Defendant NYUAD.

47.    Faculty from the Politics Program at Defendant NYUAD routinely sponsor conferences and seminars with invited participation from faculty and graduate students at Wilf Family Department of Politics at Defendant NYU.

48.    Faculty from Wilf Family Department of Politics at Defendant NYU routinely sponsor conferences and seminars with invited participation from faculty at the Politics Program at Defendant NYUAD.

49.    Several faculty from the Politics Program at Defendant NYUAD have affiliated status in the Wilf Family Department of Politics at Defendant NYU.

50.    Several faculty from the Wilf Family Department of Politics at Defendant NYU have visited the Politics Program at Defendant NYUAD for short periods as visiting affiliate faculty.

51.    From October through December 2012 Plaintiff was selected to be and did in fact serve as a visiting Affiliated Faculty in the Politics Program at Defendant NYUAD.  By all accounts Plaintiff performed such Affiliated Faculty duties in an excellent manner.

52.    During the two-plus decades of her career as a higher education professor, Plaintiff has not just an excellent teaching record, Plaintiff has extensive publications,

professional presentations, media publications, published reviews, peer-reviewed articles, three well-received books, and numerous grants and fellowships.

53.     On January 20, 2016, Plaintiff was approached by Defendant NYUAD's Social Science Dean Defendant Hervé Crès's assistant to meet with Defendant Crès.  Plaintiff met with Defendant Crès on February 9, 2016 in New York at NYUAD's office at 19 Washington Square North at which time Plaintiff was invited by Defendant Crès to visit NYUAD.

54.     Between February 2016, and December 2016 Plaintiff and Defendant Crès worked out the details for Plaintiff to spend a year in Abu Dhabi as Visiting Affiliate Faculty. The arrangement Plaintiff and Defendant Crès agreed on was for an affiliated faculty position at NYUAD for one year, from 2017-2018.

55.     On February 4, 2017, Defendant Crès requested, and Plaintiff agreed to Chair a Third-year Review Committee for a tenure track NYUAD faculty member.

56.     On August 19 2017, Plaintiff arrived at NYUAD as Visiting Affiliate Faculty for one academic year (2017-2018).  At the time, Defendant NYUAD's Political Science Department had three full-time tenured faculty members, all male Associate Professors (including Defendant Timmons and two other male faculty). There were at the time approximately eight to ten full-time untenured faculty (both ostensibly tenure track and non-tenure track).  Of those non-tenured faculty, there were only three women.

57.     On October 5, 2017, Defendant Crès and Plaintiff began discussing Plaintiff's staying on at NYUAD after the Affiliate Faculty year was up.  This followed Defendant Crès's efforts, as well as lunches with two of the male tenured faculty (one of whom was Defendant Timmons), where there was an open discussion about the need for senior women at Defendant NYUAD.

58.     A long-term move to NYUAD was costly for Plaintiff as it meant moving from the U.S, which is the center of cutting edge research in Plaintiff's fields of research, to the UAE, which is not, distancing Plaintiff from US based professional networks and opportunities in the U.S., stepping back from graduate teaching (NYUAD is a primarily undergraduate institution), scaling back Plaintiff's participation and visibility in important professional forums in the US, and delaying Plaintiff's sabbatical.

59.     However, Plaintiff was excited about the opportunity since at that point in her career Plaintiff was seeking to build an intellectual and professional life that is more international.

60.     In particular, a potential move to NYUAD was for Plaintiff an investment in the direction of an International Career.

61.     At the time, Plaintiff began discussing with Defendant Crès and the higher administration at Defendant NYU the contours of a joint appointment between Defendant NYU and Defendant NYUAD.

62.     A Joint Appointment between Defendants NYU and Defendant NYUAD is a prestigious appointment.  Unlike the position of "Affiliated Faculty," which confers only visitor status at NYUAD, a Joint Appointment confers the status of standing faculty at both institutions. In both institutions, this appointment is governed by the NYU Faculty Handbook, which the rules of individual portal campuses cannot supercede.

63.     On October 15, 2017, Defendant Crès invited Plaintiff to participate in a review of candidates in a search in political theory.  The male faculty member in charge of the search at Defendant NYUAD responded in an openly negative fashion to Plaintiff's increasing inclusion

into what had been an exclusively all-male faculty leadership team within Defendant NYUAD's Political Science Department.

64.     Defendant Crès's efforts thereafter to increasingly include Plaintiff in the decision-making within Defendant NYUAD's Political Science Department were met by increasing resistance and hostility by the all-male faculty leadership within NYUAD's Politics Program.

65.     In October 2017, at Defendant Crès's encouragement, Plaintiff began organizing a series of monthly "professionalization lunches" for junior faculty in Politics as part of Plaintiff's mentoring function.

66.     In December 2017 Plaintiff was invited by Defendant Crès to begin attending senior faculty meetings, noting that "This faculty body also acts as the search/hiring committee, and your judgement would be a great asset for us."

67.     On December 10, 2017, Plaintiff was invited by Defendant Crès to be involved in Defendant NYUAD's Social Sciences Division creating research centers as a means of channeling resources to the Division and raising its research profile.  Plaintiff was encouraged to work towards building a Research Center on identity and genetics, one of the Plaintiff's major evolving research interests.

68.     Defendant Crès endorsed this idea, encouraging Plaintiff to continue her efforts.

69.     In mid-December 2017 there were continued discussions to work out Plaintiff's Joint Appointment at Defendant NYUAD.

70.     At that same time, Defendant Crès and Plaintiff developed plans to build a center on identity and genetics and Defendant Crès agreed to fund an "identity" lunch seminar series, co-chaired by Plaintiff and a renowned sociologist to explore building such a center.

71.     The Identity Seminar ran during the 2018-2019 school year and was by all accounts a major success.

72.     By email dated December 17, 2017, Defendant Crès communicated to Plaintiff that it was his intention to bring Plaintiff on board as a standing faculty member at NYUAD with a Joint Appointment at Defendant NYU and that such relationship should be "indefinite."

73.     For a period of months, Plaintiff engaged in negotiations and discussions regarding her Joint Appointment at Defendant NYUAD.

74.     On or about May 4, 2018, Defendant NYUAD issued a letter of intent with the broad parameters of all elements of a Joint Appointment at Defendant NYUAD laid out, with a start date of September 1, 2018, with the status of standing faculty at Defendant NYUAD.  In that communication, Defendant Crès stated that while he needed to work some of the details, the intent letter was a "robust commitment."

75.     The formal contract between Plaintiff and the Defendants was finalized on or about August 31, 2018 and included within it all of the elements of a prestigious Joint Appointment relationship between Plaintiff and the Defendants: in particular, according to the terms of the appointment, Plaintiff was eligible to participate in Faculty Governance at both Defendant NYU and Defendant NYUAD.

76.     At that time, upon information and belief, Plaintiff was one of only two women among a score or more of tenured full professors full-time at Defendant NYUAD.

77.     As standing faculty at Defendant NYUAD and a Full Professor, Plaintiff became at that time the most senior member of the full-time faculty in the Politics program at Defendant NYUAD and, the only tenured woman of color in the Politics Program and the Social Science Division.

78.     This was for Plaintiff a major step in her professional development.  The Joint Appointment carried with it a secure institutional status (with the right to participate in faculty governance at NYUAD as well as NYU New York), an increase in compensation and research funding, the opportunity to pursue new interdisciplinary research agendas and deepen and expand her previous research and teaching on South Asian politics, and an enhanced institutional leadership role at Defendant NYUAD.

79.     Defendant Crès reported to the NYU New York leadership regarding Plaintiff's Joint Appointment, "We are looking forward to Kanchan's contribution to our development."

80.     Meanwhile, during 2018 Plaintiff continued her work on growing and developing Defendant NYUAD's program including the research center proposal and interdisciplinary lunch series with a focus on identity and genetics. The identity and genetics initiative drew heavily on relationships Plaintiff built with biology faculty resident at Defendant NYUAD, and the unique opportunities for interdisciplinary collaboration at Defendant NYUAD.

81.     In March 2018, with Defendant Crès's endorsement Plaintiff applied for a "Center Planning Grant" to plan a center on Identity and Genetics in collaboration with the sociologist David Cook Martin and the biologists at Defendant NYUAD.

82.     At the same time, because of her appointment at Defendant NYUAD Plaintiff was able to pursue and expand research and teaching interests in South Asia, which is one of Plaintiff's core fields.

83.     Defendant NYUAD's physical proximity to South Asia, the presence of South Asian migrants in the UAE (over 60 percent of the UAE population is comprised of migrants from South Asia) and the large number of South Asian students at Defendant NYUAD were

important for Plaintiff's existing teaching and research and to launch new initiatives related to South Asia.

84.     Also because of her appointment with NYUAD, Plaintiff was able to develop new courses, including a new J term course with a field trip component to India, and a new course on ethnic identity and democracy.

85.     The student evaluations for these new courses were enthusiastic, and Plaintiff's courses were also praised, lauded and welcomed by Defendant NYUAD's administration because of the new courses' fit with NYUAD's and NYUAD's Politics Program's curricular needs.

86.     Even before Plaintiff became a formal member of Defendant NYUAD's standing faculty, Plaintiff was appointed by Defendant Crès on a wide variety of committees including Chair, Faculty Review Committee (FRC) for a third-year review for a tenure track faculty member, Chair, Committee on Interdisciplinary Hiring; and Co-Chair, Identity Seminar Lunch Series.  During this time, Defendant Crès routinely consulted with Plaintiff on senior hires.

87.     However, things changed dramatically beginning in May 2018, when Plaintiff began experiencing explicitly gender-based hostility and obstruction in the workplace.

88.     In or about May 2018, upon information and belief, Defendant Crès reached out to Plaintiff's male colleague at NYUAD Defendant Timmons, who was at the time Program Head of the Politics Program at NYUAD, and asked Defendant Timmons to include Plaintiff on the Politics Program Search Committee.

89.     Soon thereafter Plaintiff reached out to Defendant Timmons to follow up.

90.     The Politics Program Search Committee is a committee over which Defendant Timmons exercised formal power of appointment.

91.     On May 30, 2018, Plaintiff was advised in an email from Defendant Timmons that Defendant Timmons did not plan to put Plaintiff on the committee.  Defendant Timmons stated to Plaintiff that he had in mind four NYUAD full-time male faculty members for that committee.

92.     On May 30, 2018, Plaintiff stated in an email to Defendant Timmons: "At a time when we are interested in hiring women in particular, and where having women at NYUAD who can help persuade other women to come, it seems odd that you are considering not putting me on the committee when I have both strong credentials for it, and actually want to be there, in favour of a committee which consists only of NYUAD male standing faculty."

93.     On May 31, 2018, at a meeting in Plaintiff's office, Plaintiff was told by Defendant Timmons that he (Timmons) had "had it" with "these senior women from New York."

94.     At that time Defendant Timmons stated that he would be excluding Plaintiff from the Politics Program Search Committee, citing his problems with "these senior women from New York."

95.     Plaintiff objected to this gender bias, and asked Defendant Timmons to reconsider. By the end of the end of the May 31, 2018 meeting Defendant Timmons stated to Plaintiff that he would consider Plaintiff's request to be put on the Committee.

96.     Defendant Timmons' efforts to undermine Plaintiff's success at NYUAD had already begun in April-May 2018 once it became clear that Plaintiff (one of the "senior women from New York") would be joining the standing faculty at NYUAD, with the right to participate in faculty governance, rather than with the more tenuous status of visiting faculty.

97.     In or about April-May, 2018, Defendant Timmons began criticizing Plaintiff's teaching.

98.     At the time, and for all times, Plaintiff's teaching was excellent, with, upon information and belief, better teaching evaluations than Defendant Timmons'.

99.     In response to Defendant Timmons' explicit gender bias in committee assignments, Plaintiff advised Defendant Crès that her status as a "senior woman" was the reason for her exclusion, and that such gender bias cannot stand.

100.    On June 26, 2018, Plaintiff was awarded a Center Planning Grant for a Center on Identity and Genetics.

101.    On August 31, 2018, Plaintiff signed the agreement to join Defendant NYUAD as standing faculty, with a contract for 4 years, with an agreement that the last half year would be served as a sabbatical.  It was understood between the parties that Plaintiff would necessarily be afforded the opportunity to stay on as standing faculty at Defendant NYUAD until 2026 or longer, especially as such appointment would be required for the Center on Identity and Genetics grant application for which Plaintiff would be the required Principal Investigator (the PI) on the NYUAD campus.  This understanding of renewability was central to Plaintiff's decision to move to Defendant NYUAD as an investment in her career.

102.    Within one month of her formal appointment, the environment for Plaintiff at Defendant NYUAD became increasingly hostile with Defendant Timmons actively obstructing Plaintiff's ability to succeed.  Defendant Timmons, for example, excluded Plaintiff from conference planning in her field of research and denied Plaintiff's request for visitors/collaborators (otherwise standard at Defendant NYUAD).  While Defendant Timmons included Plaintiff on the recruitment committee eventually, Defendant Timmons denigrated Plaintiff on the Committee and asked Plaintiff to perform clerical and administrative work.

103.    In addition, during this period of time, Defendant Timmons repeatedly complained to Plaintiff that she was behaving like his wife insofar as Plaintiff was calling him out on inappropriate behaviors and sexist language and behavior both towards Plaintiff directly and towards female job candidates and female colleagues.

104.    For example, Plaintiff was told by Defendant Timmons, words to the effect of: "you are like my wife, you can't let things go."

105.    A few months previously, on or about December 1, 2017, one of the few female faculty at NYUAD had filed a memo to Defendant Crès against Defendant Timmons alleging gender discrimination and gender hostility in the workplace as it regarded job candidates.

106.    This female faculty member had written in her memo that Defendant Timmons was one of those who expressed or affirmed a conviction that targeting women faculty for recruitment would "lower the quality."  This female faculty member continued: "Such statements are offensive to the women faculty in the division and to me personally, but even more importantly, they inject bias in the evaluation of candidates from the start."

107.    This female faculty member also noted that Defendant Timmons' presentation of a senior female candidate "emphasized the weaknesses of this candidate, closing with the notion that nevertheless she was a 'body' to do work that he is too busy to do himself, and that she would be good at that."  This female faculty member pointed out that this was a repeat instance of such language, and that such language "caused great consternation among some of the junior women faculty."

108.    In addition, Defendant Timmons tolerated and condoned hostility towards Plaintiff from younger (and less senior) male faculty at NYUAD, including younger male faculty

ostracizing and excluding Plaintiff from professional events and research initiatives which they initiated.

109.    For instance, one younger male faculty member felt comfortable in violating policy in asking Defendant Timmons to overrule a Capstone grade given by Plaintiff to one of his students.

110.    As seminar co-chair, this younger male faculty member also vetoed a dinner invitation Plaintiff had extended to a speaker who had referenced her work and wanted to meet her, without consultation with the speaker.

111.    Defendant Timmons also collaborated with younger male faculty in proposing a reading group and a new research initiative which excluded Plaintiff although she was eligible to participate.  When Plaintiff asked to participate in the reading group, it was cancelled.  Plaintiff was never included by this subset of male faculty in the Program in their discussions on new research initiatives even when these initiatives were in her research fields. They also did not respond to invitations Plaintiff issued welcoming them to participate in anything she organized.

112.    This was a familiar pattern in the Social Science Division and the Politics Program at Defendant NYUAD.  During the relevant time period of this Complaint, other women in more vulnerable positions had also complained of a gender-hostile culture, which included ostracism from male colleagues, and repeated belittlement and disrespect in seminars and other academic settings.

113.    Upon information and belief, similar complaints were filed against Defendant Timmons in 2017, 2018 and 2019, all reinforcing that Defendant Timmons had created and was sustaining a workplace riddled with gender-based hostility.

114.    At that time, Plaintiff began conversations with Defendant Crès raising the matter of gender-based hostility within the Politics Program at NYUAD, speaking on her own behalf and advocating for other women.  Plaintiff also tried to address the matter procedurally by asking for a meeting of Politics Program senior faculty.

115.    On November 4, 2018, at the first Politics Program senior faculty meeting called, which was called at Plaintiff's request, Defendant Timmons noted his opposition to the meeting in person, used denigrating language again towards Plaintiff and refusing to provide money for a senior faculty dinner.

116.    Subsequently, a senior male faculty member who was present at the meeting, came up to Plaintiff and stated that he was sorry that Plaintiff had been spoken to in that manner at a faculty meeting, and praising Plaintiff for responding in a way that was "firm but polite."

117.    That evening, Plaintiff again complained in writing about the gender-hostility within Defendant NYUAD, explicitly raising the issue of sexism and gender-hostility.

118.    In response, the next day, Defendant Crès told Plaintiff that her complaints were making Defendant Timmons' job more difficult.  Defendant Crès asked irritably that if Plaintiff's complaint led to Defendant Timmons' resignation, would Plaintiff be willing to take over as Program Head.  Other than that suggestion, there was no other follow up by the Defendants.

119.    In mid-November 2018 Plaintiff again wrote to Defendant Crès asking for a meeting and the meeting was held on November 14, 2018.

120.    During the November 14, 2018 meeting, after small talk for almost the full meeting time, Defendant Crès focused eventually on the topic of Defendant Timmons' behavior stating that Defendant Crès had concluded that the problems were "just interpersonal," and repeatedly refused to accept gender as an issue.

121.    In response, Plaintiff spent additional time attempting to describe the events to ensure that Defendant Crès understood that indeed the problem with Defendant Timmons arose from gender-bias and hostility.

122.    That evening Defendant Crès came to Plaintiff's office and proposed creating a "task force" to make general recommendations about the governance of the Social Science Division in the next school year, which could also consider Plaintiff's concerns regarding gender-biased hostility in the workplace among other things.

123.    The next day, Plaintiff sent a detailed response to Defendant Crès, stating: "The task force plan for next year is a great one. But there remains the question of a constructive solution in the long meantime. The issues of program culture remain, and I will on principle challenge the many routine decisions which establish or reify exclusive norms (such as decisions that keep women out of leadership positions, or play favourites among junior faculty). That is my job and the job of any senior faculty here . . . My analysis of this, for what it is worth, is that Jeff [Timmons] finds it easier to work with male hierarchies . . . But it is harder for him to work with female colleagues . . . this is an issue which will not go away and the status quo, barring some solution, is either conflict or inequity."

124.    Defendant Crès responded by reiterating that it was his belief that this was merely "interpersonal," and communicating that, against his wishes he would escalate the matter to the Provost, and only because Plaintiff's message "raises the issue at a level that, under our rules and regulations, has to involve the Provost's office."

125.    Defendant Crès had also previously dismissed an intervention by another female colleague related to Defendant Timmons's sexist behavior at a faculty meeting as well as a follow-up memo she had written to him on December 1, 2017.  This female faculty member had

written in her memo: "Instead of shutting my intervention down as a laughing matter, I had hoped you would support me and back up the silent minority of senior faculty who actually care about gender diversity." Defendant Crès wrote back reprimanding her for calling out the sexist language at the meeting, and saying that if she tried to curb everything she perceived as "potentially incorrect," then "nobody will feel free to talk anymore," and telling her that "with more diversity a better culture will spontaneously arise."

126.    Between November and December 2018, Plaintiff continued to be subject to gender-based hostility in the workplace and continued to escalate those issues to Defendant Crès to no avail, except being told that repeatedly that the problems are "interpersonal."

127.    On December 3, 2018, Plaintiff sent a memorandum to Defendant NYUAD Provost's Office.

128.    Among other things, Plaintiff complained about resistance to women in leadership positions and sexist language that affected her and other female colleagues.  "It is one thing to recruit women," she wrote, "but quite another to give them a place at the table."  Plaintiff added that her individual interventions had been met with hostility, and said that "I think it is important now for an institutional response."

129.    The Provost's Office never responded or even acknowledged Plaintiff's memorandum after it was submitted on December 3, 2018.  Six months later, having never received a response Plaintiff sent the same memorandum to a different member of the Provost's Office, and while Plaintiff received an acknowledging response, to wit, "Thanks so much for sharing, this is very helpful and interesting," Plaintiff received no follow up of any sort thereafter.

130.    While Defendant Crès and other of Defendant NYUAD's administration continued to applaud Plaintiff's successful performance in other respects (research, committee work, colloquia, etc.), other than asking for more time to respond, there continued to be silence from the Administration regarding remediating the gender-hostility within Defendant NYUAD's Social Science Division.

131.    On February 1 2019, Plaintiff filed a complaint with the Office of Equal Opportunity (the OEO) at Defendant NYU and Defendant NYUAD (it is the same office, with representatives on both campuses) against Defendant Timmons and Defendant NYUAD, outlining the gender-based hostility within the NYUAD's Politics Program and Social Science Division.

132.    Around the same time (early 2019), a second (tenure-track) female faculty member also filed a complaint against Defendant Timmons. This female faculty member chose to secure a competing offer from another institution and left Defendant NYU, explicitly stating that her departure was due in part to the gender-based hostility perpetrated against her by Defendant Timmons.

133.    Immediately after filing the OEO Complaint and continuously thereafter, Plaintiff was subject to retaliation for whistleblowing on the gender-based hostility perpetrated by Defendant Timmons.

134.    Such retaliatory treatment included (i) attempting to renege on agreed-upon course reductions, requiring Plaintiff to seek the intervention of the Provost's office; (ii) Defendant NYUAD accepting frivolous and retaliatory accusations brought by Defendant Timmons against Plaintiff; (iii) Defendant Crès launching a baseless investigation against Plaintiff without informing her of the charge, the procedure or the outcome; and (iv) reneging on

21

a promise to recruit a job candidate related to Plaintiff-led initiative on Identity and Genetics for the Social Science Division.

135.    When Plaintiff specifically reported to Defendant Crès that the gender-hostility was now palpably bleeding into her treatment by younger male colleagues at NYUAD, Defendant Crès never responded to Plaintiff regarding this complaint.

136.    In or about that time, Plaintiff informed the OEO of the explicitly retaliatory treatment.

137.    Between March 25, 2019 and March 28, 2019, Plaintiff met with the OEO in New York and Linda Mills, then a representative of NYU's Provost Office.  At that time, Mills was NYU's Vice Chancellor and Senior Vice Provost for Global Programs and University Life.  In September 2023, Mills took office as President of NYU.

138.    At that time (March 2019), Plaintiff asked either for the gender-based hostility at NYUAD and the retaliatory treatment to be addressed or that Plaintiff be returned to Defendant NYU on terms that were not disadvantageous to Plaintiff.

139.    In response, Mills instructed Plaintiff to take "time off" during the 2019-20 academic year, while the new incoming Vice Chancellor of Defendant NYUAD took office. Mills indicated that this was a stopgap solution until the new incoming Vice Chancellor of NYUAD was in a position to address questions of gender hostility and workplace culture.

140.    At that time (March 2019), Plaintiff asked and offered to continue to serve on committees but was instructed by Mills to step down from all committees.

141.    Mills promised Plaintiff that there would be an explicit statement sent to the Social Science Division acknowledging climate – and gender – as an issue and that Plaintiff would be protected from further retaliation.

22

142.    At that time, Mills did not agree to any investigation into Plaintiff's complaints regarding gender hostility within the workplace.

143.    At that time, the OEO informally discouraged Plaintiff from asking for an investigation, saying that in the end, whether there was an investigation or not, it was the University leadership which would have to address the issues, which Mills had offered to do on behalf of the Provost's office.

144.    However, the retaliation continued and there was never, as promised, an explicit acknowledgment of climate – and gender – as a problem in the Social Sciences division.

145.    In the meantime, two untenured female faculty left the NYUAD Politics Program. Both were among the women who had, upon information and belief, escalated their complaints to either the OEO or to HR and the senior NYUAD administration.

146.    Upon information belief, one of these women resigned and the other was forced out soon after lodging her complaint.

147.    When Plaintiff raised this with the OEO, Plaintiff was told by its Director that if she was dissatisfied with the state of affairs following her discussions with Mills, she should "feel free to renew your pursuit of a complaint with my office."

148.    On May 8 2019, Plaintiff reached out to the OEO in New York asking them to launch a formal investigation in response to her complaint against Defendant Timmons.

149.    Around the same time, one of the female faculty in the NYUAD Politics Program, who had already announced her decision to leave, also asked for a formal investigation into her complaint of gender-hostility against Defendant Timmons.

150.    Also around the same time, in May 2019, in a lengthy report of gender-based misconduct, seven female faculty members (not including Plaintiff) complained to the Head of

Human Resources at NYUAD about gender discrimination and gender-based hostility within the NYUAD campus.

151.    The Head of Human Resources at NYUAD responded by promising to raise the issues with the NYU New York "higher administration."

152.    Upon information and belief nothing ever became of this alleged escalation of the complaints of gender-hostility at NYUAD.

153.    On August 27, 2019, Plaintiff wrote to the new incoming Vice Chancellor of NYUAD (Mariet Westermann) regarding gender discrimination within the workplace at Defendant NYUAD's Politics Program.

154.    Plaintiff wrote "I want to bring to your attention questions of climate at NYUAD that affect women disproportionately but also affect us all. This is a problem that is pervasive across the university, and it affects us in the Division of Social Sciences too. Sometimes those in positions of authority are the source of the problem or compound the problem. I write to you because, after working within all the available channels to address these matters internally, I believe that it will take strong university-wide leadership to address these issues."

155.    Plaintiff never received a response.

156.    Westermann took office on September 1, 2019 and on September 5, 2019 Westermann announced the departure of NYUAD's Office of Equal Opportunity (OEO) representative.  This representative had previously conducted a formal investigation of a complaint filed by another female faculty member at Defendant NYUAD (in the Humanities program).  Such a formal investigation, upon information and belief, was a very rare occurrence at Defendant NYUAD.

157.    Westermann did not replace the OEO Representative position at Defendant NYUAD for almost two academic years.

158.    From that moment forward (September 2019), Vice Chancellor Westermann excluded Plaintiff from all committees and research initiatives over which she had power of appointment or invitation that were offered to and provided to other members of Defendant NYUAD's Politics Program and Social Science Division.

159.    In September 2019 the OEO reported to Plaintiff that it found no evidence of any policy violations in Plaintiff's complaint.  At that time, the OEO similarly rejected the complaint filed by the other female NYUAD Politics faculty member.

160.    Demoralized, Plaintiff spent the period from September 2019 into June 2021 retreating from her previous roles on campus, instead focusing on Plaintiff's writing and teaching.

161.    During this period of time Plaintiff learned of rumors being spread around Defendant NYUAD's Politics Program and Social Science Division about problems with her teaching and her personality.  These rumors were without basis (Plaintiff had excellent teaching evaluations, with scores from 4.5-5 on a five-point scale and glowing testimonials about her committee work and colleagueship from faculty, staff colleagues, and administrators).  But these rumors further interfered with Plaintiff's capacity to continue her effectiveness as a pedagogue and researcher and also affected (and continue to affect) Plaintiff's reputation at NYUAD, especially among Plaintiff's colleagues in the Social Sciences.

162.    In April 2021, Plaintiff sent an email to the (Interim) Dean and the faculty attempting to address these unfounded and disparaging rumors. There was no response from the Interim Dean.

163.    During this period of time, there was a wholesale change in Defendant NYUAD leadership with the appointment of a new Provost, and a new Social Science Dean in addition to a new Vice Chancellor.

164.    During this period of time NYUAD launched a climate survey, which revealed the problematic climate on campus and revealed that gender hostility and gender bias was a prevalent and apparent problem.

165.    The climate survey also pointed to the pervasive fear of retaliation by those who made complaints, and its effect on depressing the number of complaints that were made.  While much of the data from the survey was withheld, the report that was released noted that "high numbers of participants (31.4%) who indicated that their experiences at NYUAD were NOT FREE of harassment, bullying and/or intimidation;" that "36% of women said that their experience at NYUAD were not free of harassment compared to 27% of men"; and that "People who experienced harassment were also more fearful of retaliation . . . which also explains the low rates of official complaints."

166.    On June 13, 2021, the new and incoming Dean of Social Sciences at Defendant NYUAD (Defendant Paula England) sent a message to all NYUAD faculty announcing that she would arrive at NYUAD on August 15, 2021 and become the Dean effective September 1, 2021.

167.    On July 28, 2021, Plaintiff spoke with Defendant England on a zoom call and indicated that Plaintiff would like to extend her Joint Appointment contract at NYUAD.

168.    At that time, Defendant England responded with an enthusiastic "yes" and asked Plaintiff for the details of how she wanted the terms of her renewal drawn up (for example, how many years and on what terms).

169.    After being advised by Defendant England that she would work on the renewal, Plaintiff then reported that there was a gender climate issue in NYUAD Politics Program, and that Plaintiff and another female faculty member had made formal complaints about same in the past.  Plaintiff added that she remained worried about continued retaliation in Defendant NYUAD's Politics Program and the Social Science Division.

170.    In response, Defendant England asked Plaintiff to give her more information on the gender-based hostility issues within the Politics Program and the Social Science Division.

171.    On July 28 2021 Plaintiff sent to Defendant England a memo detailing the gender hostility within the Politics Program and the Social Science Division.

172.    Plaintiff was hopeful that this issue would finally be taken seriously because Vice Chancellor Westermann had, in the wake of George Floyd's death, made a number of pledges "to advance inclusion, diversity, belonging and equity (IDBE) as the core of our mission" and Defendant England, a renowned sociologist, specialized in the study of gender inequity.

173.    Defendant England never responded to the memo in any fashion.

174.    Instead, six weeks later, on September 9, 2021, Defendant England advised Plaintiff that notwithstanding her assurances otherwise, Plaintiff's NYUAD appointment would not be extended.

175.    Defendant England's explanation for refusing to renew Plaintiff's NYUAD appointment was pretextual.  Defendant England contended that "there were several features of your contract which were exceptions to what is allowed for faculty who serve in Abu Dhabi but retain positions in New York. The provost's office says that such a contract cannot be extended." Defendant England also cited an informal rule at NYU saying contracts could not be extended and added "Even if that NY limitation weren't present, it isn't possible from the NYUAD side."

27

176.    Defendant England explicitly stated at the time that her refusal to renew Plaintiff's NYUAD appointment – as had been promised – had nothing to do with Plaintiff's work performance, which she said was "highly valued."

177.    In fact, for all times relevant to this complaint Plaintiff's work performance has never been challenged and is by all accounts exceptional.

178.    Defendant England's explanation for refusing to renew Plaintiff's NYUAD appointment were and are untrue.  Many contracts at NYUAD have exceptions and have been extended, there is no obstacle to doing a new contract with standard features, no written evidence of the informal rule at Defendant NYU that Defendant England cited, and the Dean of Social Sciences at Defendant NYU had written to Plaintiff in correspondence copied to Defendant England stating that he was happy to support Plaintiff's request to stay on at Defendant NYUAD.

179.    The refusal to extend the Joint Appointment damaged Plaintiff's research, teaching and compensation.  It removed Plaintiff from the multidisciplinary faculty collaborations located at Defendant NYUAD that she had spent years building, rendering Plaintiff ineligible to apply for funding for a Center on Identity and Genetics, undermined Plaintiff's teaching and research on South Asia and substantially reduced Plaintiff's salary and research funding.

180.    On September 12, 2021 Plaintiff wrote to Defendant England acknowledging the notice from Defendant England that her Defendant NYUAD appointment would not be extended and asking for a meeting to discuss other ways for Plaintiff to stay involved with Defendant NYUAD's campus.

181.    By exploring other ways of remaining involved with Defendant NYUAD's campus, Plaintiff was attempting to mitigate the damage caused by Defendants' violative conduct in refusing the promised renewal of her appointment at Defendant NYUAD.

182.    Plaintiff's identity and genetics collaboration depended on her faculty status and residence at Defendant NYUAD.  Plaintiff would not be eligible to submit a grant application for this collaboration listing her as the PI if she were not standing faculty at Defendant NYUAD. Plaintiff also did not have the colleagues and students or the same professional relationships, or the support for multidisciplinary research in New York.  Plaintiff had invested a large portion of her time and effort at Defendant NYUAD in building this collaboration.  Plaintiff would also not be able pursue her field-based research on South Asia without the research support and physical proximity to South Asia and the South Asian diaspora at Defendant NYUAD.  Plaintiff would also not be able to teach students from across South Asia, and incorporate field visits to South Asia in her teaching, which was possible only at Defendant NYUAD.

183.    Short-term teaching at NYUAD would allow her to continue with her collaborations, research activities and teaching at least in a diminished form. It also offered some additional compensation.

184.    Defendant England refused to meet with Plaintiff and instead wrote a response to Plaintiff that "What I can say, based on my discussions with the Administration is NYUAD would not give you anything like your current contract again."   She also wrote that "I don't think that NYU would allow you to be affiliated faculty again."

185.    Defendant England added that there was no other way for Plaintiff to continue to be remain involved with Defendant NYUAD other than shifting her tenure there, that if Plaintiff wanted to shift her tenure to Defendant NYUAD Plaintiff would have to go through a

competitive search process again at Defendant NYUAD, and that there was no funding for any such search.

186.    This was untrue.  Standard policies for a Joint Appointment, visiting faculty affiliations, J term teaching and other such opportunities remained in place, and the handful of faculty who have shifted their tenure from Defendant NYU to Defendant NYUAD or initiated such a process have done so through an internal administrative procedure similar to moving between departments on the same campus, and not through a competitive search process.

187.    Plaintiff wrote an email to Defendant England challenging her explanation and complaining about what Plaintiff perceived to be retaliatory treatment, and turning Plaintiff into a persona non grata.  Defendant England did not respond.

188.    On September 21 2021, Leigh Watts, the Assistant Director for Community Outreach and Academic Appointments at Defendant NYUAD's New York office sent Plaintiff an email on behalf of himself and Zvi Ben-Dor Benite, Associate Vice Chancellor for Global Network Faculty Planning at Defendant NYU, noting that "After 21-22, you will return to the NYU NY system (payroll, HR, benefits, and housing, if applicable) without any further notice.  All teaching and administrative obligations henceforth will be managed by your NYU NY school and department … Please also be in touch directly with your NYU NY department chair, Sanford Gordon, about departmental office space and teaching in Fall 2022."

189.    On October 14, 2021, Defendant England announced that Defendant Timmons – the person Plaintiff identified as the perpetrator of gender-based hostility within and on the NYUAD campus – had been promoted to the position of Associate Dean of Faculty Affairs and that Defendant Timmons would be working directly with Defendant England "on mentoring, tenure cases, and other matters to do with faculty affairs."  These were the exact issues on which

Plaintiff had complained that Defendant Timmons had infused his adminstratorship with gender bias and hostility.

190.    On February 2, 2022, Plaintiff learned for the first time that sometime in the Fall of 2021, also after Plaintiff had raised the gender bias issues with Defendant England, Defendant England had excluded Plaintiff from the tenure evaluation for two candidates whose work was squarely in Plaintiff's field of expertise.

191.    Excluding Plaintiff from these tenure review committees was a violation of Defendant NYUAD's Promotion and Tenure guidelines and Plaintiff's job description as defined by those guidelines.

192.    Plaintiff's exclusion from tenure evaluation committees was and is a palpable adverse action insofar as Faculty Promotion and Tenure, and Recruitment committees are among the most important Program committees at Defendant NYUAD.  Serving on these committees is a highly valued part of service to a faculty member's department or program and one of the yardsticks on which job performance is evaluated.  They are also a recognition of field expertise and standing and a determinant of professional respect.

193.    Upon information and belief, Defendant Timmons, as Defendant England's primary advisor on the Politics program and the Associate Dean for Faculty Affairs, was involved in the decision to exclude Plaintiff from this routine, but essential appointment to tenure review.

194.    Once Plaintiff found out that she had been excluded, Plaintiff asked for the reason and was told in an email by Defendant England "I cannot remember the reason." Defendant England admitted that Plaintiff was, in Defendant England's words, "well-qualified" to conduct this review.

31

195.    Defendant England excluded Plaintiff not only from service on these Promotion and Tenure Committees as mandated by Defendant NYUAD's Promotion and Tenure guidelines, but has to date also excluded Plaintiff from <u>all</u> committees over which she had power of appointment.

196.    Since the date that Plaintiff was asked by Defendant NYU to step down from committee work while her complaint was addressed (March 2019) Plaintiff was never put on <u>any</u> Politics program committee or Defendant NYUAD Social Science Divisional committee again.

197.    These exclusions were unrelated to performance or qualifications.  Prior to filing a complaint, Plaintiff had been appointed to numerous such committees and effusively praised for her qualifications and for being a "great asset" to such committees and for her "priceless contribution."

198.    Plaintiff had come full circle.  It was precisely this type of blatant and intentional exclusion which led to her filing a complaint in 2019.  Now, however, it was not just Defendant Timmons who was perpetrating gender bias, he was also backed by the new Dean, Defendant England.

199.    Serving on Committees -- and in particular promotion and tenure committees -- is an essential component of Plaintiff's duties and essential for Plaintiff to maintain professional status within the faculty community.

200.    Any promotion to positions of academic and administrative leadership within and outside the university community requires evidence of service on such committees.  By being blocked from membership in important committees, Plaintiff was obstructed from such advancement.

201.    Prior to filing a complaint, Plaintiff had been selected, trained and prepared for leadership.  Plaintiff had been invited to serve on the Defendant NYUAD's Women's Leadership Initiative (2018-19) and asked by Defendant Crès's assistant on his behalf to attend a "Leadership Workshop" because "Given your leadership role, we think this training would be beneficial to you."

202.    Since the date that Plaintiff was asked by Defendant NYU to step down from committee work while her complaint was addressed (March 2019), no administrator at Defendant NYUAD ever raised the possibility of leadership or opportunities for Plaintiff's advancement again.

203.    By contrast, Defendant Timmons was subsequently and repeatedly promoted.

204.    Notwithstanding her efforts to secure renewal of her appointment at NYUAD, on December 31, 2021, Plaintiff's teaching and faculty status as a Joint Appointee at NYUAD was terminated and in fact Plaintiff was not renewed as a faculty member at NYUAD.

205.    At the time of her Joint Appointment at Defendant NYUAD, Plaintiff and Defendants had agreed that Plaintiff would take the Spring semester 2022 as a paid sabbatical in residence at Defendant NYUAD.

206.    At the time of the original Joint Appointment, since it was presumed that Plaintiff's Joint Appointment would be renewed, it was specified that the sabbatical would be in residence at Defendant NYUAD.

207.    Plaintiff's understanding also was that her contract as Joint Appointment at Defendants NYU and NYUAD would continue during this sabbatical.  This was also the understanding of Defendant Dean England who had written to Plaintiff on September 9 2021 that her contract was "scheduled to run out next summer."

33

208.    The sabbatical was jointly funded by Defendant NYU and Defendant NYUAD.

209.    However on December 5, 2021, the Provost's office informed Plaintiff that her contractual end date at NYUAD was "December 31, 2021."  Consequently, Plaintiff's status as Defendant NYUAD standing faculty was withdrawn even during this period.

210.    Plaintiff also learned that the circumstances in which Plaintiff's contract was terminated had not been kept confidential and that it had been communicated to Plaintiff's colleagues that Plaintiff had wanted to renew her contract and stay working at Defendant NYUAD, but that Plaintiff had been refused.

211.    This disparaging information had also become common knowledge on the NYUAD campus and Plaintiff was subject to gossip mongering there.  One male faculty member from a different division within Defendant NYUAD stated to Plaintiff at this time, "Your days here are numbered."

212.    The only people who had knowledge of these circumstances at Defendant NYUAD and could have spread this information were Defendant England and Defendant Timmons.

213.    The Defendants' discriminatory treatment has continued to date and affected Plaintiff's reputation and professional opportunities at Defendant NYU as well.

214.    On May 4, 2022, Sanford Gordon, the Chair of Defendant NYU's Politics Department in New York circulated the committee slate for the 2022-23 academic year, which was when Plaintiff would be beginning her forced return back to Defendant NYU.  In July 2021, prior to NYUAD's sending Plaintiff back to New York in disgrace, Gordon had emailed Plaintiff saying "I would like to do whatever makes you happy/involve you in graduate admissions and faculty recruitment on the square."

34

215.    Following the exclusion of Plaintiff from promotion and tenure committees at NYUAD and correspondence between Gordon, Defendant England and upon information and belief Defendant Timmons about this exclusion, Plaintiff was not included on any faculty recruitment or graduate training committee, or promotion and tenure committees for NYU Politics Department faculty. These are the three most important types of committees in the Department, that affect both professional standing and career advancement.

216.    Plaintiff had routinely served on the same committees during her years of service to the Defendants, prior to filing a complaint.

217.    Defendant NYU members with a comparable record and seniority were all included.

218.    During the period of time May 24-June 9, 2022, Plaintiff taught a short-term course in Summer 2022, shortly before her departure from Defendant NYUAD.  Defendant England inadvertently revealed to Plaintiff that Defendant England had not approved the decision to allow Plaintiff to teach the course: she been asked to sign a letter of approval only after the opportunity to teach the course had already been offered to Plaintiff and she was not supportive of Plaintiff teaching this course.

219.    The course went very well; Plaintiff's teaching evaluations were excellent, and Plaintiff ran a well-attended faculty symposium throughout that she was asked to repeat.

220.    On September 1, 2022, Plaintiff returned to working on Defendant NYU's New York campus.

221.    Plaintiff was subject to gossip mongering in New York.  Plaintiff's colleagues in New York told Plaintiff that they were aware that she did not want to return to New York but was sent back by Defendant NYUAD.

35

222.    On September 4, 2022, Plaintiff was informed that her formal application for renewed teaching opportunities on Defendant NYUAD's campus had been denied.  Plaintiff had applied for these opportunities in December 2021, despite the discouragement of Defendant England.  Plaintiff received this response long after the deadline for notifying applicants of this decision had passed.

223.    Notwithstanding Plaintiff's open instruction to Defendants that she wished to return to teaching on Defendants' NYUAD campus, Plaintiff was advised by Defendants that she would not be allowed to teach on Defendant NYUAD's campus, notwithstanding that fact that Plaintiff's male colleagues, and those who had not complained about gender discrimination, were invited back to the NYUAD campus to teach.

224.    On September 6, 2022, Plaintiff requested in writing an explanation for what appeared to be an indefinite "no" to any request now or in the future to return to Defendant NYUAD.

225.    Defendants, by and through Associate Vice Chancellor for Global Education at NYUAD, made explicit that Plaintiff would not be allowed to return to the NYUAD campus in 2023 and that any opportunity to return to the NYUAD campus -- even for the limited "J term" -- would need the approval of Defendant NYU's Social Science Dean (Defendant England).

226.    However, Defendant NYU's Social Science Dean (Defendant England) had refused to meet with Plaintiff to discuss these opportunities.

227.    Further, numerous male faculty colleagues and others who had not complained about gender discrimination at Defendant NYUAD were repeatedly invited and approved to teach on NYUAD campus during this same time period.

228.    On September 27, 2022, Bryan Waterman, the former NYUAD Vice-Provost for undergraduate education was recruited by Defendant NYUAD's office in New York to organize an event on teaching and mentoring Defendant NYUAD students in New York.  The goal was to introduce Defendant NYUAD students to NYU faculty with ties to NYUAD.  There was a routine invitation list for this on which Plaintiff's name was included.  However, Defendants removed Plaintiff's name from this list while other Political Science colleagues (all male) were included.

229.    In or around this time, a faculty review committee regarding Defendant NYUAD's tenure and promotion matters -- the FRC -- was constituted, which required the participation of Defendant NYU Politics faculty members.  Plaintiff was the most qualified person in the candidate's field.  Plaintiff was also the faculty member in New York with the longest experience at Defendant NYUAD.  And again, Defendants excluded Plaintiff.  The result was a committee with an entirely male membership, with two NYU New York Politics faculty members.  Plaintiff's exclusion was notable and glaring.

230.    On December 1, 2022 the tenured faculty at Defendant NYU's Department of Politics met to discuss the report of a Promotion and Tenure Committee for a certain NYU-based faculty member.  Such committee was constituted again of only men.  Plaintiff is and was at the time one of the most cited scholars in Defendant NYU Politics Department in the candidate's fields and had chaired his third-year review committee.  Yet, once again, Plaintiff was removed from this promotion and tenure committee.

231.    Defendant NYU's Department of Politics Chair Sanford Gordon had the power of appointment on Defendant NYU's New York based committees, and, upon information and belief, participated in the selection of and outreach to NYU New York faculty members

37

appointed to Faculty Review Committees (FRCs) committees by the NYUAD Social Dean Defendant England for promotion and tenure of NYUAD candidates.

232.    On March 27 2023, Plaintiff wrote to Gordon reiterating that she was eager to serve and asking to be included on such committees, and in particular, on review committees in her field, "commensurate with my credentials and expertise."

233.    Plaintiff noted that she had served on such committees in NYU New York previously and reiterated her credentials for continued service, which indicated greater experience on professional review committees within and outside the University than most male NYU colleagues routinely being placed on committees: "Those credentials include serving on NYU's Promotion and Tenure Committee, chairing the Political Economy Section of the American Political Science Association, serving on the editorial boards of the *American Political Science Review*, *Comparative Political Studies* and *Comparative Politics*, chairing and serving on multiple award committees at the American Political Science Association, serving on the Political Science panel of the National Science Foundation, and chairing or serving on review, recruitment, ad hoc and other committees at NYU and NYUAD and NYU Shanghai."

234.    In so doing, Plaintiff was again trying to mitigate the damage she had suffered and see a way forward to the future.  Plaintiff wrote: "Iterative exclusions, an iterative legal process and continued embattlement in no one's interests. The best thing for all of us as we look to the future to do the right thing, for its own sake, at the outset. Voice can help. Thus this note."

235.    Gordon responded by belittling Plaintiff's expertise and credentials: "It cannot be the expectation of a faculty member that perceived overlap of research expertise is a sufficient condition for appointment to a given committee."

236.    There is a clear before and after in the language Defendant NYU's Chair used in this response.  In July 2021, prior to Defendant NYUAD sending Plaintiff back to New York in disgrace, Gordon had emailed Plaintiff saying "I would like to do whatever makes you happy/involve you in graduate admissions and faculty recruitment on the square."

237.    Yet, after the retaliatory actions by Defendant NYUAD, Gordon excluded Plaintiff from faculty recruitment, graduate admissions committees and review committees in Plaintiff's field.  In addition, Gordon belittled Plaintiff's credentials and Plaintiff's request to be included: "It cannot be the expectation of faculty members to be included in committees because of 'perceived overlap' of research interests."

238.    In the academic year 2023-24, Gordon again did not include Plaintiff on any faculty Promotion and Tenure committee or recruitment committee for the NYU New York Department.  She was also not included on the graduate admissions committee.

239.    In contrast, Plaintiff's male colleagues, many with less distinguished records, field expertise and committee experience, were asked to serve, often in repeat roles.

240.    Gordon also demoted Plaintiff further, taking the unusual step of overlooking her seniority and asking her to serve on a committee under the chairmanship of a male associate professor with significantly limited committee experience.

241.    The exclusions at Defendant NYU and Defendant NYUAD have had and continue to have an adverse effect also on Plaintiff's ability to recruit and train graduate students on return to New York: the open undermining by her colleagues at Defendant NYU makes it difficult to recruit, train and advocate for them effectively.  Further, a close association with her may render them subject to retaliation.

242.     Access to opportunities at Defendant NYUAD (conferences, graduate fellowships, advising relationships with NYUAD faculty) are now an important part of graduate careers in the Politics Department at Defendant NYU.  The hostility towards plaintiff at Defendant NYUAD means that Plaintiff is not able to offer such opportunities to her students.

243.     Defendants continue to actively obstruct any opportunity for Plaintiff to return to Defendant NYUAD.  For example, on June 6, 2023, Associate Vice Chancellor and Vice Provost for Global Education informed Plaintiff that her application to teach in NYUAD for J term 2024 had been turned down again: "Unfortunately, we won't be including your course in the curriculum for J-Term 2024.  The Deans are privileging new faculty and meeting new curricular needs."

244.     Plaintiff's male colleagues, and those who had not filed a complaint, were invited back again in repeat roles.

245.     Discriminatory and retaliatory conduct continues to date.

246.     For instance, on December 2 2023, Plaintiff wrote again to Associate Vice Chancellor for Global Education at Defendant NYUAD asking to be considered to teach during J term 2025.

247.     The Associate Vice Chancellor responded saying: "Thanks for your abiding interest in teaching in J-Term. Those courses have been very well received by students (of course---you are an amazing teacher. As you know, it is the Dean (and for NYU-based faculty also Zvi Ben Dor Benite ((the Associate Vice Chancellor for Global Network Faculty Planning)) who approve faculty and courses for invitation.  I then work with faculty to make the J-Term happen.   Could you reach out to both Paula and Zvi to let them know of your interest?"

248.    Plaintiff wrote to both Associate Vice Chancellor for Global Network Faculty Planning Zvi Ben Dor Benite and Defendant England.  Benite acknowledged but did not respond.  Defendant Dean England did not acknowledge or respond.

249.    On December 20 2023, Associate Vice Chancellor for Global Education at Defendant NYUAD asked Plaintiff to hold off applying until further notice.  However, all other faculty had been invited at an information session on December 11, 2023 to begin submitting applications immediately.

250.    On January 22, 2024, Plaintiff wrote to Associate Vice Chancellor for Global Education at Defendant NYUAD and Defendant Dean England noting that she had been asked to hold off while Plaintiff's colleagues and others had been submitting applications as per the information at the global information session and an active interfolio link.

251.    Plaintiff also noted that "the application process requires a letter of support from the NYUAD Dean, who has not responded to my note, and who also chose not to meet with me when I raised the issue previously."

252.    On January 22 2024, Plaintiff asked again: "(1) What can I do to be considered in a fair and transparent manner to teach a J term course at NYUAD (2) What can I do to be considered in a fair and transparent manner for these other opportunities for 7 weeks and longer?"

253.    On January 23 2024, Defendant England responded, disclaiming responsibility for the J term application process and discouraging Plaintiff from applying for anything else, citing "pressing needs" and "budgetary restrictions" "that would probably not lead to anything in 24-25."

254.    On February 9, 2024, Plaintiff submitted an application regardless through the Interfolio link for this purpose, and also forwarded a copy to Defendant England. This application was to teach a J term course as well as for other teaching opportunities on Defendant NYUAD's campus. Plaintiff wrote to Defendant England: "It would be hard to miss all of the negative signals  . . . Nevertheless, I have applied, because teaching at NYUAD is important to my career, because I believe that my qualifications and performance allow me to contribute there and compare well with other invitees, and because my understanding is that they are a good fit with the stated priorities and policies of NYUAD and the Social Science division."  There was no acknowledgment.

255.    However, on March 14, 2024 Defendants NYU and NYUAD inexplicably announced an entirely new application process without reference to the previous one, invited applications for J-term teaching in 2025 applications with a new deadline, and asked those who had submitted their application before to resubmit.  This covered up the earlier process in which Plaintiff had been singled out and asked not to apply.

256.    However, upon information and belief, Defendants had already been in touch informally with other faculty about teaching during J-term.

257.    On March 14, 2024, Defendants NYU and NYUAD also posted new criteria for successful applications <u>after</u> already receiving and recording the applications received.  These criteria were not mentioned in December 2023, or in the Interfolio link made available in December 2023, or in any previous J term application process.

258.    Some were demonstrably false, and contradicted the criteria mentioned and used previously.  In fact, Plaintiff had previously been asked and encouraged by Defendant NYUAD

to develop J-Term courses to fit precisely those categories which were now suddenly excluded. This established gerrymandered grounds for rejection of Plaintiff's courses after the fact.

259.    Nevertheless, Plaintiff submitted a new application meeting all new criteria.

260.    As of April 2024, in contrast to Plaintiff's male colleagues and despite her field expertise, an outstanding record of performance, and in some cases in violation of Defendant NYUAD's rules and procedures Plaintiff was:  (i) terminated from the NYUAD campus and effectively barred from returning; (ii) excluded from all committees related to the Politics program at NYUAD appointed by the NYUAD Social Science Dean; (iii) excluded from all Recruitment, Promotion and tenure Committees for New York based faculty in the Department of Politics appointed by the NYU Department of Politics Chair, as well as from graduate admissions committees;  (iv) excluded from short term teaching on the NYU Abu Dhabi campus; (v) refused permission to teach any courses in NYU global over which the NYUAD Dean has jurisdiction; (iv) excluded from teaching and mentoring meetings in New York related to NYUAD; and (v) openly undermined in Plaintiff's department in Defendant NYU's New York campus.

261.    As a result, Plaintiff's reputation has suffered, her compensation has been substantially reduced, opportunities for seeking additional compensation through short term teaching closed off, her research funds have been substantially reduced, her research has been substantially damaged, her graduate and undergraduate teaching opportunities have both suffered, she has been blocked from all advancement within NYUAD and NYU and rendered less competitive for job offers outside, given the prolonged exclusion from leadership positions or any kind of committee experience combined with the damage to her reputation. Efforts to mitigate this damage have all been obstructed, and there is no end in sight.

262.     Plaintiff's mental health has also suffered.  The discrimination and retaliation, combined with gaslighting and the adverse effect on her career over a number of years, has led to isolation, anxiety, a questioning of self-worth, a lack of belonging, and a shrinking from professional spaces which Plaintiff previously inhabited with confidence.

263.     The exclusions are not related to performance, which has been outstanding on every measure, something acknowledged by Defendant NYUAD administrators who have called her "an amazing teacher," told her that her research and teaching "has been highly valued" and have thanked her for her "priceless contribution" and for being a "great asset" on committees. No administrator has pointed to a problem with performance even when pressed for a reason for excluding her. Instead, the pretexts for exclusion have been vaguely stated "pressing needs,"  "I don't know," "I don't remember,"  I was not involved," and silence.

264.     The exclusions are not related to University or Divisional policy.  Plaintiff's profile and performance place her squarely at the center of the mission which Defendant NYU and Defendant NYUAD have outlined in documents such as Defendant NYUAD's Academic Strategy, its Diversity and Inclusion statements and the research and curricular priorities laid out by Defendant NYUAD's Social Science Division and the Politics program.  Prior to Plaintiff's filing a complaint, she was praised and supported precisely because of this fit.

265.     Further, Plaintiff's performance and the steps she followed in the filing of a complaint, have been scrupulously in keeping with Defendant NYUAD and Defendant NYU's stated policies and priorities.

266.     In fact, in several instances, those in positions of authority at Defendant NYUAD have violated its own policies, norms and stated priorities.

267.    The connections between Defendant NYU's Politics Department and Defendant NYUAD's Politics Program reinforce and amplify gender discrimination in each.  For instance, upon information and belief, at least two tenured male members of the NYU Politics Department participated in the rumors spread about Plaintiff's teaching and personality in Defendant NYUAD's Politics program.

268.    Defendant Timmons also cited tenured male members of the NYU Politics department in his frivolous counter-accusations against Plaintiff.

269.    The Politics Program at Defendant NYUAD has an exceptionally poor record on gender representation.  As of April 2024, it has, upon information and belief, eighteen male faculty, almost all tenure-track or tenured, and five female faculty, three on the tenure track, one an adjunct lecturer, and one Professor of Practice.

270.    The Department of Politics at Defendant NYU also has one of the worst records of NYU departments on inclusion and diversity on race, national origin and gender.  Its male faculty members have made public statements about African-American and Asian American minorities that prompted news coverage, university wide petitions and an unusual statement critical of these faculty members by the NYUAD higher administration.

271.    Plaintiff is one of a handful of female Full Professors at Defendant NYU's Department of Politics and the only tenured woman of color there as well.

272.    Plaintiff has had her NYU New York colleagues make comments about her skin color, one of whom then followed up on email.

273.    Defendants (both NYUAD and NYU) have a poor record on gender equity at senior levels compared to most other political science departments.  Defendants refuse to give senior women a place at the table.  In the near two decades that Plaintiff has been at Defendant

NYU, there was only one senior offer made to a woman, compared to at least fourteen (14) or fifteen (15) senior offers to men, most of whom were co-authors, proteges and favorite sons. Virtually all of these senior offers were non-competitive, with no other candidates interviewed or even considered.

274.    When the Plaintiff previously objected to the gender bias in hiring produced by this classic "old-boy" hiring procedure, the then Chair of the Politics Department at Defendant NYU defended that procedure while not acknowledging the gender bias.  He wrote, in an email to Plaintiff: "At the senior level we should not be hiring people who have not made sufficient impact that we have not heard of them."

275.    Since its inception and during all times relevant to this Complaint, Defendant NYU's Political Science Department has never had a female chair except for a brief period between 2000-2003, when, upon information and belief, it was emerging from receivership. This is a worse record than any Political Science Department at any comparative university.

276.    The gender bias in senior hiring and in the leadership of the Politics department was permitted and supported by the NYU New York Social Science Deans, who were for all relevant times also senior male faculty from the Politics Department.

277.    Women graduate students in Wilf Family Department of Politics at Defendant NYU have, upon information and belief, also complained about gender hostility.

278.    Plaintiff was previously vocal about the glass ceiling for senior women in Defendant NYU's Department of Politics, as well as the adverse ways in which this lack of gender representation affected the environment for younger faculty and students, in memos and data submitted to Chairs and Deans at Defendant NYU NY.

279.     Plaintiff's efforts in this regard produced and were the proximate cause of chronic hostility, retaliation and disrespect which Plaintiff suffered under.  But the exclusions at Defendant NYUAD tipped the scales for Plaintiff in Defendant NYU as well and damaged her reputation, teaching, research, prospects for advancement and well-being in New York in ways substantial enough for her to pursue legal recourse.

280.     As of April 2024, if not earlier, Plaintiff has been terminated from and refused any opportunity of any sort from participation in Defendants' Abu Dhabi campus, while also being undermined and blocked from advancement in NYU New York, all as a consequence of filing a complaint on gender equality.

281.     Plaintiff's efforts to correct and remediate gender discrimination within Defendant NYUAD turned an appointment at NYUAD that was a career investment into not only a dead-end but professional quicksand.

282.     Defendant Timmons on the other hand has been promoted twice since Plaintiff filed a complaint, first to Associate Dean for Faculty Affairs in the NYUAD Social Science division, and then again to the senior leadership team at NYUAD within NYUAD's Stern School as Associate Dean of Faculty.

283.     Plaintiff's reputation, compensation, research, teaching, career trajectory, and mental health have all suffered as a result of Defendants' discrimination perpetrated against Plaintiff.

## JURY DEMAND

284.     Plaintiff requests a trial by jury.

## AS AND FOR A FIRST CAUSE OF ACTION
Discrimination Under Title VII of the Civil Rights Act of 1964
(Against Defendants NYU and NYUAD)

285.    Plaintiff restates the foregoing as if fully set forth in this cause of action.

286.    By the foregoing, Defendants discriminated against Plaintiff violation of the Civil

Rights of 1964, 42 U.S.C. §§ 2000e et seq.

287.    Plaintiff has been harmed and damaged as a result of such discriminatory

treatment in the workplace.

## AS AND FOR A SECOND CAUSE OF ACTION
Discrimination Under the New York State Executive Law
(Against All Defendants)

288.    Plaintiff restates the foregoing as if fully set forth in this cause of action.

289.    By the foregoing, Defendants discriminated against Plaintiff violation of the New

York State's Executive Law, N.Y. Exec. Law §§ 290 et seq.

290.    Plaintiff has been harmed and damaged as a result of such discriminatory

treatment in the workplace.

## AS AND FOR A THIRD CAUSE OF ACTION
Discrimination under the New York City Administrative Code
(Against All Defendants)

291.    Plaintiff restates the foregoing as if fully set forth in this cause of action.

292.    By the foregoing, Defendants discriminated against Plaintiff violation of New

York City's Administrative Code, N.Y.C. Admin. Code § 8-107.

293.    Plaintiff has been harmed and damaged as a result of such discriminatory

treatment in the workplace.

## AS AND FOR A FOURTH CAUSE OF ACTION
Retaliation Under Title VII of the Civil Rights Act of 1964
(Against Defendants NYU and NYUAD)

294.     Plaintiff restates the foregoing as if fully set forth in this cause of action.

295.     By the foregoing, Defendants have retaliated against Plaintiff for opposing

discrimination under the Civil Rights of 1964, 42 U.S.C. §§ 2000e et seq.

296.     Plaintiff has been harmed and damaged as a result of such discriminatory

treatment in the workplace.

## AS AND FOR A FIFTH CAUSE OF ACTION
Retaliation Under the New York State Executive Law
(Against All Defendants)

297.     Plaintiff restates the foregoing as if fully set forth in this cause of action.

298.     By the foregoing, Defendants have retaliated against Plaintiff for opposing

discriminated against Plaintiff in violation of the New York State's Executive Law, N.Y. Exec.

Law §§ 290 et seq.

299.     Plaintiff has been harmed and damaged as a result of such discriminatory

treatment in the workplace.

## AS AND FOR A SIXTH CAUSE OF ACTION
Retaliation under the New York City Administrative Code
(Against All Defendants)

300.     Plaintiff restates the foregoing as if fully set forth in this cause of action.

301.     By the foregoing, Defendants retaliated against Plaintiff for discriminating against

Plaintiff in violation of New York City's Administrative Code, N.Y.C. Admin. Code § 8-107.

302.     Plaintiff has been harmed and damaged as a result of such discriminatory

treatment in the workplace.

REQUEST FOR RELIEF

Plaintiff requests the following relief and judgment against Defendants.

(i)     Enter a declaratory judgment, stating that Defendants and all of their affiliates'
and subsidiaries' practices, policies and procedures subjected Plaintiff to discrimination and
retaliation in violation of Federal, State and City Law.

(ii)    Award injunctive relief against Defendants, their affiliates, and subsidiaries, from
engaging in the unlawful practices, policies, customs, and usages set forth herein.

(iii)   Awarding injunctive relief directing Defendants, their affiliates, and its
subsidiaries to take such affirmative action as is necessary to ensure that the effects of these
unlawful employment practices are eliminated and do not continue to affect Defendants'
employees.

(iv)    Enter judgment against Defendants on all causes of action and an award of actual
and compensatory damages, including for lost pay and benefits, compensatory and emotional
distress damages and medical expenses, punitive and/or exemplary damages, liquidated
damages, attorneys' fees, pre- and post-judgment interest, all in an amount to be determined at
trial by the jury.

(v)     Award such further relief as this Honorable Court deems just, equitable and
proper.

Dated: Rhinebeck, New York
April 22, 2024

Nathaniel K. Charny
Charny & Wheeler P.C.
42 West Market Street
Rhinebeck, New York  12572
Tel - (845) 876-7500
Fax - (845) 876-7501
Email - ncharny@charnywheeler.com

Attorneys for Plaintiff Kanchan Chandra